Turn to our next case, which is Jeffrey Sidney at Al versus Time Warner Good morning. May it please the court. My name is Matthew Blitt on behalf of the appellants. And let me start off here as one of the managing attorneys at my firm, I get the pleasure of reviewing summary judgment motions and oppositions to summary judgment motions. And the younger the associate, the more likely is that I get a longer stand, a longer idea of what the standard in a summary judgment motion is. And I always tell them, you got to shorten it up. I think the judges understand that standard by now. And unfortunately here in this case, the favorable light, there is no light on any of the evidence that was submitted by the plaintiffs. It was completely ignored and left in the dark. The job title versus reality was completely ignored here. And I think the most important part is to really understand what exactly the appellants did on a daily basis and what the real amount of time during the day was spent on what exactly they were doing. For example, on a typical day they would arrive at work, check their emails and voicemails at the company's workplace. Then they would prepare the paperwork and the orders for the day for the installations. They attend meetings with their supervisors because their supervisors need to know exactly where they were going to be on every given day. They would then go to the warehouse, collect the necessary equipment for the day's installations. Then they would travel to the installations. Think about what a cable installation entails. They arrive at the location, they take all the equipment out of their truck, ladders, knee pads, pads, drills, hammers, wires, boxes and remotes that are needed to do the daily installs of every single customer. All this is based upon the training they received from Tween. They go into the customer's home, they have to figure out where to put the main cable box, whether it's in a customer's closet, take out all their clothes in their neatly packed boxes. Then they have to go down on their knees, put the cable wire on the walls, climb on ladders, put the cable wires up on top of the ceilings, run them by where each television set is in each room. Then show the customer how to work the devices. Troubleshoot any problems that they're having. This all takes a significant amount of time and they're doing five to ten of these installations every single day. Then, I mean you could even ask, if you even ask the customers how long it takes a cable guy, I'm sure they'll tell you it's two hours as opposed to thirty minutes to an hour. But these installations take a significant amount of time on a daily basis and that's exactly what they're doing. Are they really wearing safety helmets and vests when they were doing all this? Of course they have to. Is there a testimony to that? I mean I was interested in what you just gave as a description of what cable installers do. Did any of these plaintiffs give the description that you just gave as to what they spent their time on? Yeah, exactly. But if you look in the decision, there's nothing there that discusses any of it. That's the problem. In the affidavits? Affidavits, in the affidavits and the depositions. And the two affidavits were before the district court at the time? Of course. The neocomposites? Uh-huh. And if you look at the decision, there's nothing in it that discusses any of it. Forget about a favorable light, there's no light. That's the problem. The district court suggested that they were relying upon undisputed facts. I mean he was relying specifically on undisputed facts and that's fair to say. And your objection is that you had some facts out there which perhaps were disputed but were not considered because it was reliance just upon undisputed facts? Is that what you're suggesting? No. The undisputed facts were the facts submitted by the appellees. There's no facts that were even addressed of the appellants. Well, there was a lot of conversation about all of the sales meetings. Just as an example, the sales manager would bring your clients in. There would be all kinds of requirements that they participate in improving their sales operation. In fact, there's one particular section in which they were told, I guess in quote, we should spend a couple of evenings a week knocking on doors to improve their sales. There seems to be a focus from the sales. Isn't that relevant to this? Yes and no. What they actually did is the important part. They didn't go door to door knocking on doors to build up sales. Their job was to speak with the individual property managers and then the property managers would take all their pamphlets and information, provide it to the tenants, and the tenants would then call our clients. They weren't going knocking door to door. They weren't soliciting door to door. They had no time to do that because the majority of the day was spent installing. Were the DSRs going door to door in apartment buildings? They had separate people going door to door. Oh, the DSRs. Right. These two people were DSRs before, right? The direct sales representatives? Correct. For the same buildings that your clients covered, were DSRs actually going in and knocking on doors in those apartments? Yes. That was not their responsibility. They were not there to knock on doors. They weren't going to impede on somebody else's job and responsibilities because I'm sure there was going to be significant fighting between the two. Did the DSRs do any installation at all? The DSRs did their own installation. I think the DSRs did not. No, the DSRs didn't do installations. They had separate people that did installations. So the problem here But your two people, the installations were up to a point, right? When you needed like some real wiring to the outs to the street or something like that, you had to have a truck and a ladder to get to the pole, right? I don't know the answer to that. But I know what their responsibility was. And the problem is that their main responsibility was not going door to door and knocking on doors. Their responsibility was the install. I agree with apparently the evaluation which was coming from management of your both, in that they need to go door to door more often than they're doing already. That was in fact an evaluation that was conducted of both of your clients. That demonstrates that they weren't doing the door to door sales and that their responsibilities really were the installations because that was taking up the majority of their day and they couldn't go door to door. Okay, but No, it's not that they weren't supposed to go door to door. I understand that was in those. But that really wasn't the reality of what their job actually was. Their job was to deal with the building managers and do the installations. They got the calls directly from the customers. They went to the customer site, did the installs. They took calls while working at the facility or on the phones when they were receiving them directly going to jobs. As they're going to jobs to do installs, they were getting calls to do new ones. Technical support, they had to do troubleshooting, all this stuff. Wasn't most of the installs though for pre-existing cable though? I mean, a tenant leaves, a new tenant comes in. The apartment's pre-wired already for cable. Don't you just, the installation you go in, maybe you plug the box in and program it and then leave. Isn't that what typically is done? No, that's not always the case at all because it's always new equipment and the equipment's always evolving over time. I notice my time is up. Some of these, they gave the customer a self-installation kit and there was testimony that, well, sometimes they would help the customer out and do it themselves. But if it's something that, in principle, the consumer could do himself or herself, that doesn't sound like the kind of job you were describing before with the truck and the helmets and the ladders and all that. On a very rare occasion, that does happen. But they're doing five to ten installs a day. Most of them are not that case. I see the point you're making and I'm just wondering, is the amount of hours the key here really? I mean, I've been familiar with people who sold very complex, and I realize this is a different, what they're selling is different, but who were like engineers who would go to plants of potential customers and convince them to buy elaborate machinery, and then they would spend the next six months after it was delivered living at that place, making sure it all worked right and sending modification orders back home. They spent a real lot of time at the customer's factory making sure everything was properly set up and worked properly and could be corrected by their company if there was a problem. But it was a sales job and all of that installation work had a lot to do with keeping the customer happy. And at least in those cases, I would have no question that person's job was a salesperson. So I realize this is a different case. What I'm trying to get at is, is the way that a court should assess this, is it really so the way they're ultimately evaluated and the way they're ultimately paid is about how many accounts did you get? I think here it's based upon the primary duty, and their primary duty was the installations. And that's, they spent a significant, much more time doing the installations. Is that how you decide what the primary duty is? The primary duty is get the account and do what it takes to get the account. And at the end of the month, we're going to see how many of these things you sold. And we're going to appreciate that because some of your time is spent doing other stuff and actually keeping that customer happy and satisfied and making sure the thing works, you know, we're not going to assume that you're spending eight hours a day knocking on doors. But at the end of the day, you're a salesperson and your job is to get the sales. The sales was to the building itself. It was speaking to those managers of those buildings. It's when tenants move into a building, they speak to the manager. Oh, the manager tells them, oh, by the way, in this building you have Time Warner, RCN, or whatever. These are your options. Here's the cards. And then the tenant just calls the representatives and orders it. It's not really typically a sales pitch where they are going and explaining exactly what the different options are. That's what I'm wondering. And, you know, maybe this is something that your answer is going to be, well, that should be a jury question. I appreciate that. But let's assume it is a jury question for the moment, and we're trying to figure out how the jury gets instructed. I'm wondering, you know, if the primary duty, if you get the buildings all signed up for Time Warner, then you're doing a good job. And the way you make sure that that building stays signed up with Time Warner is by providing good service to the tenants of the building. But the real duty is keep these buildings with us. Don't let them go over to the competition. If that were the case, if I'm a juror and I concluded that what Time Warner is interested in is keeping these buildings satisfied and making sure they stay on board with Time Warner and getting new buildings to go over to Time Warner, do I conclude that they were outside salesmen then, even if they spend a lot of their time answering questions and even doing maintenance and showing up to make the customers, the tenants happy? Making the tenants happy, all of that stuff has nothing to do with the sales of the product. It has to do with the maintenance of the product, which is separate and distinct from the door-to-door salesman. Okay. Thank you, Mr. Blatt. You've got a couple of minutes. You're reserved. Thanks. How about your name? Yes, I did, Your Honor. May it please the Court, Michael Cabot for the appellee Time Warner Entertainment Advanced New House Partnership. A couple of items that I would like to cover. First of all, appellant's arguments and the one that was just focused on is this idea that the primary duty for these appellants was installations, not sales. Okay. Then they have a second argument related to how those sales are made. But the focus here was on the primary duty. And I will tell you that they made the exact same arguments to the district court, and the district court correctly rejected both. Now, I will also note that while they try and frame these arguments in terms of factual disputes, these are not factual disputes. In fact, plaintiffs, I'm sorry, appellants' own moving papers specifically state that the district court relied on no fewer than 40 undisputed facts in finding that the appellants were properly within the outside sales exemption of the Fair Labor Standards Act. Well, let me assume that that's absolutely correct and that the district court is relying on the undisputed facts that suggest that sales were the primary duty. Now, Mr. Blitz says, but there are also facts, which I guess you are telling me are also undisputed, to the effect that they spent on a given day, they would do five to ten installations that took a half an hour to two hours each to do. Is that an undisputed fact? Well, the fact that they did installations is an undisputed fact. Well, the fact that they — this account that Mr. Blitz gave here and in his brief of how many hours a day and how many hours per installation and how many installations per day, is that an undisputed fact? The amount of time that he described, there was a fact that stated it was approximately 30 minutes to do an installation, maybe an hour. That was the undisputed fact. However, what Mr. Blitz ignores is the fact that the only time an installation is being done by either of these appellants or any territory sales rep, the only time an installation is being done is when there is a sale made. So when they talk about they did five to ten sales a day, what they are actually saying is they sold five to ten times a day. And that installation is part and parcel of the sales process. And it is part and parcel of how they get these sales. And what I mean by that is the installation, it's a sales tool. It's how they close the sale. Every installation they conducted was a sale because they only installed what they sold. It was after a phone call was made to them by the tenant, right? It was after a phone call was made, and that phone call was received only because of the promotion and sales efforts they made at the apartment complexes to which they were assigned. The brochure called this number if you want to get cable, and then they called the plaintiffs here, right? Well, they did that, yes, Your Honor, and they did far more than that. They testified, I mean this is undisputed, that they would spend, they would make sure they were meeting with the apartment managers every week or every other week at the absolute latest to keep that relationship up. They testified that they needed good relations with the apartment managers because that was how they got their sales. They testified that they would do things like some minor troubleshooting because that put them in good graces with the apartment managers. This is all marketing and promotion to referral agents which the courts have held. That type of work is absolutely incidental to and part and parcel of sales. They were doing all of these things, and the whole idea was to generate sales. So . . . Your opposing counsel has said that the district court applied the wrong standard in summary judgment. Essentially what I think they're suggesting is that the district court took all of these undisputed facts, the 40 undisputed facts, the result based upon that made a calculation that the primary duty was sales. Their response is, well, there were a lot of other facts there that they may have raised by way of affidavit, etc., which were not undisputed, but which suggested that perhaps the majority of their work was related to something other than sales, but that the district court did not consider those facts, just considered the undisputed facts which suggested that it was a sales operation. How would you respond to that? I would say that Your Honor is correct in terms of how they characterized it, but that is simply not the case. While they claim that the district court failed to consider other facts, they have no evidence that that's the case. Certainly a district court is not required to list in its order every single fact of record to reflect that it considered the arguments made, number one. Number two, I would say that the district court, if you . . . It discussed all of those, and those are the facts that they're claiming were not addressed. And so what I would tell you is they were addressed. The other thing that I would say is this isn't a question of disputed facts. In their briefing, the appellants actually stated the district court relied upon pertinent facts not in dispute that tended to support Tween's argument concerning appellants' primary duty and the outside sales exemption. My question is, is the primary duty question itself a question that is ultimately a question for a jury or not? It is not, Your Honor. And the reason I say that is because . . . Can you cite me a case that says that or that explains that if you have all undisputed facts, and I take it that's what you're saying, is either there are no disputed facts or you're prepared to take, for purposes of summary judgment, their version of any facts in dispute about how many hours they spent or how many installations they did and so on. If all the facts are undisputed, is it then a question of law for the court whether on those facts there is a . . . the primary duty is sales or something else? That is exactly what I'm saying, Your Honor. And what is the authority for that? The exemption question is a mixed question of law and fact. That Second Circuit, Myers v. Hertz . . . If so is negligence. Isn't it a mixed question of law and fact? And that goes to the jury. But the question of . . . so the question of how the employee spent their time, that's a question of fact. And that's undisputed. Right. The question as to whether the particular activities excluded the appellants from the outside sales exemption, that is a question of law. And that's Icicle Seafoods v. Worthington, Supreme Court. So there is no question. What they are arguing about is they don't like the court's legal conclusions. They don't like how the court applied its legal determination to the undisputed facts to conclude that these people were outside sales. Could the jury conclude on the facts that the plaintiffs offered that these sales representatives spent as much as five hours per day doing installations? I don't know that they could say that they spent as much as five hours a day doing installations, but they could certainly determine that they spent a certain amount of time doing installations. Five to ten installations per day, would a reasonable fact finder say, okay, split the difference, let's say 7.5 every day, and each one takes a half hour to an hour, split the difference, call it three quarters of an hour. Three quarters times 7.5 is, I'm not sure, I'm not that quick at arithmetic, but it's starting to sound like upwards of five hours per day. Why couldn't a jury reach that conclusion if the affidavit testimony is treated as an undisputed fact? Well, a jury could reach, obviously, a determination as to how much time was spent on installations. Okay, so if you got that, I mean, if you made that conclusion, then you're saying it is still, it is not a question, a jury question as to what is the primary duty. No, that is a question of law, Your Honor. It is black letter law that it is a question of law as to how, as to whether the duties then are, would qualify somebody for the outside sales exemption. Is it really a question of a judge making a determination based upon a combination of all factors, both undisputed as well as perhaps even accepting what you consider to be disputed facts, you put them all together and essentially a determination is made, no reasonable juror could in fact conclude that this was anything other than a sales job. That is absolutely the case, Your Honor. In this case, no juror could come to any other conclusion. First of all, I would note that the amount of time, and I believe one of your honors actually mentioned that. The question here is not how much time. You don't look at whether it's five hours of installation as to how you determine whether somebody's primary duty is sales. And in fact, the Department of Labor has held that it could be as little as one or two hours a week. Doing that is more than enough to satisfy the primary duty of sales. I would also note that when the- It depends though, right? It depends. It's relevant. At least something relevant for the fact finder is what do you actually do during your day. That is correct, Your Honor, and what these people do during the day is they spend all of their time, everything they do is focused towards sales. Their job is territory sales rep. They were hired because of their sales experience. Their job, if you look at the job description, was to develop sales from these apartment buildings. They would go and try and establish good relationships with these apartment managers, again, because they were encouraging them to make sure that the appellant's information was in the tenant's hands. Do you dispute that they were wearing hard hats and safety vests and had all these tools on their belts and were bringing cable in? I do dispute that, Your Honor. That is absolutely not in the record. There is no record of them having to wear- It's not in the record? It's in the Kapusa's affidavit. Not hard hats. They would bring tools, no question, because they would have to go into an apartment and attach- and had to wear hard hats, safety glasses, and use a voltage detector. Paragraph 9. They would use safety goggles, and this is in the record, when they would have to, for example, possibly have to go through bushes. But they didn't use ladders because that would be what installation techs would do. They would not use ladders. They did not do full installs. They could do the basic installs. But, again, everything that they did with respect to the installations was going towards sales. They were paid towards sales. If you look . . . Thank you, Mr. Cabot. Thank you, Your Honor. You've used up your time. Mr. Lee has a couple more minutes to go. I promise not to use it up. Just one point, Judge Sessions, about them knocking on the doors. Yeah, that was in the memo, but one of the main undisputed facts is they didn't do it, and they wouldn't have been fired for not doing it and complying with that memo. I think that's an important factor as well. Thank you very much. I just want to raise one question. My understanding is the majority of their income was from commissions. Is that correct? Fifty-eight to 76% of their income was all commissions? The salary structure, yeah. I mean, the salary structure . . . But, really, our argument is that it still goes down to 29 CFR 541-700A, which really goes to what the primary duty of their job was, which was the installation. In other words, you're saying that shouldn't be the salary structure? I mean, isn't that what you're arguing? Oh, no, no, I'm not saying it shouldn't be the salary structure. They had to do it. I mean, that's how they got paid. That was the salary structure. But you're basically . . . your argument is that they shouldn't be paid so heavily on commission because they should get a higher hourly wage and get paid overtime. That's what you're saying the law requires. Yes. Okay. Thank you. Thank you both. We'll reserve decision.